## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| DUSTY MATHESON, on behalf of himself and all others similarly situated, <br><br>            Plaintiff, <br><br> v. <br><br> HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, <br><br>          Defendant. | Case No. _____ <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Dusty Matheson, individually and on behalf of all similarly situated persons, alleges the following against Hartford Life and Accident Insurance Company ("Hartford" or "Defendant") based upon personal knowledge with respect to himself and on information and belief derived from, among other things, investigation by his counsel and review of public documents, as to all other matters:

## I.     INTRODUCTION

1.     Plaintiff brings this class action against Hartford for its failure to properly secure and safeguard Plaintiff's and other similarly situated Hartford clients' employees' sensitive information, including full names, dates of birth, Social Security numbers, home states, and zip codes ("personally identifiable information" or "PII").

2.     Defendant and its subsidiaries provide "life, health, home, business, and accident insurance to individuals, families, groups, and businesses across the world."[1]

---

[1]     *The Hartford Life and Accident Insurance Company Files Notice of Data Breach Impacting Thousands*, JDSᴜᴘʀᴀ (Aug. 8, 2023), https://www.jdsupra.com/legalnews/the-hartford-life-and-accident-5426280/ (last visited Aug. 22, 2023).

3.     Upon information and belief, former and current employees at companies affiliated with Defendant are required to entrust Defendant with sensitive, non-public PII, without which Defendant could not perform its regular business activities, as a condition of their employment and/or to obtain certain employee benefits at Defendant's client companies.  Defendant retains this information for many years and even after the consumer relationship has ended.

4.     By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiff and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

5.     According to Defendant's Notice Letter, the compromised PII included individuals' full names, dates of birth, Social Security numbers, home states, and zip codes.

6.     Defendant failed to adequately protect Plaintiff's and Class Members PII – and failed to even encrypt or redact this highly sensitive information.  This unencrypted, unredacted PII was compromised due to Defendant's negligent and/or careless acts and omissions and their utter failure to protect employees' sensitive data.  Hackers targeted and obtained Plaintiff's and Class Members' PII because of its value in exploiting and stealing the identities belonging to Plaintiff and Class Members.  The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

7.     Plaintiff brings this action on behalf of all persons whose PII was compromised as a result of Defendant's failure to: (i) adequately protect the PII of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents.  Defendant's conduct amounts at least to negligence and violates federal and state statutes.

8.      Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures and ensure those measures were followed by its IT vendors to ensure that the PII of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use.  As a result, the PII of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party.  Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

9.      Plaintiff and Class Members have suffered injury as a result of Defendant's conduct.  These injuries include: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

10.     Plaintiff and Class Members seek to remedy these harms and prevent any future data compromise on behalf of himself and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

## II.     PARTIES

11.     Plaintiff Dusty Matheson ("Plaintiff Matheson"), is, and at all times mentioned herein was, an individual citizen of Maroa, Illinois.

12.     Defendant Hartford Life and Accident Insurance Company is a national insurance company organized under the laws of Connecticut with its principal place of business at One Hartford Plaza, Hartford, Connecticut 06155.  The Hartford and its subsidiaries offer life, health, home, business, and accident insurance to individuals, families, groups, and businesses across the world.  Defendant can be served through its registered agent, CT Corporation System, 67 Burnside Avenue, East Hartford, Connecticut 06108.

## III.     JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2).  The amount in controversy exceeds $5 million, exclusive of interest and costs.  The number of class members is over 100, many of whom reside outside the state of Connecticut and have different citizenship from Hartford, including Plaintiff.  Thus, minimal diversity exists under 28 U.S.C. §1332(d)(2)(A)

14.     This Court has jurisdiction over Hartford because Hartford operates in this District.

15.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because Defendant's principal place of business is located in this District, a substantial part of the events giving rise to this action occurred in this District, and Hartford has harmed Class Members residing in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    Defendant's Business and the Data Breach

16.    Defendant and its subsidiaries provide "life, health, home, business, and accident insurance to individuals, families, groups, and businesses across the world."[2]

17.    Plaintiff and Class Members are current and former employees at companies that contracted with Defendant for the provision of insurance and/or other employee benefits.

18.    As a condition of their employment and/or to obtain certain employee benefits, Hartford requires that its clients' employees, including Plaintiff and Class Members, entrust it with highly sensitive personal information.

19.    The information held by Defendant in its computer systems, or those of its vendors, at the time of the Data Breach included the unencrypted PII of Plaintiff and Class Members.

20.    Upon information and belief, Defendant made promises and representations to its clients' employees, including Plaintiff and Class Members, that the PII collected from them as a condition of obtaining employee benefits from Defendant would be kept safe, confidential, that the privacy of that information would be maintained, and that Defendant would delete any sensitive information after it was no longer required to maintain it.

21.    Indeed, Defendant's Privacy Policy provides that: "[t]he protection and security of your information is important to us.  We work to adopt reasonable physical, administrative, and technical safeguards to protect the personal information transmitted between users and the Services and the personal information stored on our servers, and we require third parties with whom we share personal information to use reasonable precautions to safeguard such information."[3]

---

[2]    *Id.*

[3]    *Online Privacy Policy*, THE HARTFORD, https://www.thehartford.com/online-privacy-policy (last updated on Mar. 9, 2023) (last visited Aug. 5, 2023).

22.    Plaintiff and Class Members provided their PII to Defendant, directly or indirectly, with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

23.    Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII.  Plaintiff and Class Members relied on the sophistication of Defendant to keep their PII confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information.  Plaintiff and Class Members value the confidentiality of their PII and demand security to safeguard their PII.

24.    Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties and to audit, monitor, and verify the integrity of its IT vendors and affiliates.  Defendant has a legal duty to keep its clients' employees' PII safe and confidential.

25.    Defendant had obligations created by the FTC Act, Gramm-Leach-Bliley Act, contract, industry standards, and representations made to Plaintiff and Class Members, to keep their PII confidential and to protect it from unauthorized access and disclosure.

26.    Defendant derived a substantial economic benefit from collecting Plaintiff's and Class Members' PII.  Without the required submission of PII, Defendant could not perform the services it provides.

27.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

28.    Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members,

causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.  Moreover, Defendant failed to exercise due diligence in selecting its IT vendors or deciding with whom it would share sensitive PII.

29.     The attacker accessed and acquired files Defendant shared with a third party containing unencrypted PII of Plaintiff and Class Members, including their Social Security numbers and other sensitive information.  Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

30.     Plaintiff further believes that his PII, and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

    **B.**     **Defendant Acquires, Collects, and Stores Plaintiff's and Class Members' PII**

31.     As a condition of employment and/or to obtain certain employee benefits from his employer, Plaintiff and Class Members were required to give their sensitive and confidential PII, directly or indirectly, to Defendant.

32.     Defendant retains and stores this information and derives a substantial economic benefit from the PII that they collect.  But for the collection of Plaintiff's and Class Members' PII, Defendant would be unable to perform its services.

33.     By obtaining, collecting, and storing the PII of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known that they were responsible for protecting the PII from disclosure.

34.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential and maintained

securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

35.    Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the PII of Plaintiff and Class Members or by exercising due diligence in selecting its IT vendors and properly auditing those vendor's security practices.

36.    Upon information and belief, Defendant made promises to Plaintiff and Class Members to maintain and protect their PII, demonstrating an understanding of the importance of securing PII.

37.    Indeed, Defendant's Privacy Policy provides that: "[t]he protection and security of your information is important to us.  We work to adopt reasonable physical, administrative, and technical safeguards to protect the personal information transmitted between users and the Services and the personal information stored on our servers, and we require third parties with whom we share personal information to use reasonable precautions to safeguard such information."[4]

38.    Defendant's negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

**C.    Defendant Knew or Should Have Known of the Risk Because Insurance Companies in Possession of PII Are Particularly Susceptible to Cyber Attacks**

39.    Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting insurance companies that collect and store PII, like Defendant, preceding the date of the breach.

---

[4]        *Id.*

40.     Data thieves regularly target companies like Defendant's due to the highly sensitive information that they custody.  Defendant knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

41.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[5]

42.     Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack.  As one report explained, smaller entities that store PII are "attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[6]

43.     In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the PII that they collected and maintained would be targeted by cybercriminals.

44.     As a custodian of PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it by Plaintiff and Class members, and of the foreseeable

---

[5]     *See 2021 Data Breach Annual Report*, ITRC, at 6 (Jan. 2022), https://notified.idtheftcenter.org/s/ (last accessed on Aug. 22, 2023).

[6]     Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection_(last accessed Aug. 22, 2023).

consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

45.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

46.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

47.     Additionally, as companies became more dependent on computer systems to run their business,[7] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[8]

48.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to potentially thousands of individuals' detailed, PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

---

[7]     Danny Brando, et al., *Implications of Cyber Risk for Financial Stability*, BD. OF GOVERNORS OF THE FED. RSRV. SYS. (May 12, 2022), https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html (last accessed on Aug. 22, 2023).

[8]     Suleyman Ozarslan, Ph.D., *Key Threats and Cyber Risks Facing Financial Services and Banking Firms in 2022*, PICUS SEC. INC. (Mar. 24, 2022), https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022 (last accessed on Aug. 22, 2023).

49.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

50.     The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe.  Once PII is stolen – particularly Social Security numbers – fraudulent use of that information and damage to victims may continue for years.

51.     As an insurance company in possession of its clients' current and former employees' PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to them by Plaintiff and Class Members and of the foreseeable consequences if its data security systems were breached.  This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach.  Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

### D.     Value Of Personally Identifiable Information

52.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[9] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[10]

---

[9]      17 C.F.R. §248.201

[10]     *Id.*

53.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web.  Numerous sources cite dark web pricing for stolen identity credentials.[11]

54.     For example, PII can be sold at a price ranging from $40 to $200.[12]  Criminals can also purchase access to entire company data breaches from $900 to $4,500.[13]

55.     Social Security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.  The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiffs and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.  Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

---

[11]     Anita George, *Your personal data is for sale on the dark web.  Here's how much it costs,* DIGIT. TRENDS (Oct. 16, 2019),  https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/  (last visited Aug. 22, 2023).

[12]     Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017),  https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Aug. 22, 2023).

[13]     *In the Dark*, VPNOVERVIEW (2019),   https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Aug. 22, 2023).

56.     What's more, is that it is no easy task to change or cancel a stolen Social Security number.  An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse.  In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

57.     Even then, a new Social Security number may not be effective.  According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[14]

58.     For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[15]  Such fraud may go undetected until debt collection calls commence months, or even years, later.  Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[16]  Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud.  Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

---

[14]     Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015 4:59 AM ET), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited on Aug. 22, 2023).

[15]     *Identity Theft and Your Social Security Number*, SOCIAL SEC. ADMIN. (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Aug. 22, 2023).

[16]     *Id*.

59.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

60.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts.  The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change – names and Social Security numbers.

61.     This data demands a much higher price on the black market.  Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[17]

62.     The fraudulent activity resulting from the Data Breach may not come to light for years.  There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used.  According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft.  Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.  As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[18]

---

[17]     Tim Greene, Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers, IT WORLD, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Aug. 22, 2023).

[18]     *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. GOV'T ACCOUNTABILITY OFF., at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf (last visited Aug. 22, 2023).

### E.        Hartford Failed to Comply with FTC Guidelines

63.        The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making.   Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. §45.  *See, e.g., FTC v. Wyndham Worldwide Corp.,* 799 F.3d 236 (3d Cir. 2015).

64.        In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.  The guidelines note that businesses should protect the personal employee information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems.  The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

65.        The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

66.        The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect employee data by treating the failure to employ reasonable and

appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA.  Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

67.    These FTC enforcement actions include actions against insurance companies, like Defendant.

68.    As evidenced by the Data Breach, Hartford failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its vendor's data security practices.  Hartford's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

69.    Hartford was at all times fully aware of its obligation to protect the PII of its clients' current and former employees yet failed to comply with such obligations.  Defendant was also aware of the significant repercussions that would result from its failure to do so.

**F.    Hartford Failed to Comply with the Gramm-Leach-Bliley Act**

70.    Hartford is a financial institution, as that term is defined by Section 509(3)(A) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. §6809(3)(A), and thus is subject to the GLBA.

71.    The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]."  15 U.S.C. §6809(3)(A).

72.    Defendant collects nonpublic personal information, as defined by 15 U.S.C. §6809(4)(A), 16 C.F.R. §313.3(n), and 12 C.F.R. §1016.3(p)(1).  Accordingly, during the relevant time period Defendant was subject to the requirements of the GLBA, 15 U.S.C. §§6801.1, *et seq.*, and is subject to numerous rules and regulations promulgated on the GLBA statutes.

73.     The GLBA Privacy Rule became effective on July 1, 2001.  *See* 16 C.F.R. Part 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the CFPB became responsible for implementing the Privacy Rule.  In December 2011, the CFPB restated the implementing regulations in an interim final rule that established the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R. §1016 ("Regulation P"), with the final version becoming effective on October 28, 2014.

74.     Accordingly, Defendant's conduct is governed by the Privacy Rule prior to December 30, 2011 and by Regulation P after that date.

75.     Both the Privacy Rule and Regulation P require financial institutions to provide employees with an initial and annual privacy notice.  These privacy notices must be "clear and conspicuous."   16 C.F.R.§§313.4 and 313.5; 12 C.F.R. §1016.4 and 1016.5.   "Clear and conspicuous means that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice."   16 C.F.R. §313.3(b)(1); 12 C.F.R. §1016.3(b)(1).  These privacy notices must "accurately reflect[] [the financial institution's] privacy policies and practices."  16 C.F.R. §§313.4 and 313.5; 12 C.F.R. §§1016.4 and 1016.5.  They must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic personal information.  16 C.F.R. §313.6; 12 C.F.R. §1016.6. These privacy notices must be provided "so that each consumer can reasonably be expected to receive actual notice."  16 C.F.R. §313.9; 12 C.F.R. §1016.9.  As alleged herein, Defendant violated the Privacy Rule and Regulation P.

76.     Upon information and belief, Defendant failed to provide annual privacy notices to employees after their relationship ended, despite retaining these employees' PII and storing that PII on Defendant's network systems.

77.     Defendant failed to adequately inform their employees that they were storing and/or sharing, or would store and/or share, the employees' PII on an insecure platform, accessible to unauthorized parties from the internet, and would do so after the employee relationship ended.

78.     The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. §6801(b), requires financial institutions to protect the security, confidentiality, and integrity of employee information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of employee information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of employee information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances.  16 C.F.R. §§314.3 and 314.4.

79.     As alleged herein, Defendant violated the Safeguard Rule.

80.     Defendant failed to assess reasonably foreseeable risks to the security, confidentiality, and integrity of employee information and failed to monitor the systems of its IT partners or verify the integrity of those systems.

81.     Defendant violated the GLBA and its own policies and procedures by sharing the PII of Plaintiff and Class Members with a non-affiliated third party without providing Plaintiff and Class Members (a) an opt-out notice and (b) a reasonable opportunity to opt out of such disclosure.

**G.     Hartford Failed to Comply with Industry Standards**

82.     As noted above, experts studying cybersecurity routinely identify insurance companies as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

83.     Some industry best practices that should be implemented by insurance companies dealing with sensitive PII, like Hartford, include but are not limited to: educating all employees; strong password requirements; multilayer security including firewalls; anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data; and limiting which employees can access sensitive data.  As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

84.     Other best cybersecurity practices that are standard in the insurance industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points.  As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

85.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for

Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

86.     Defendant failed to comply with these accepted standards in the insurance industry, thereby permitting the Data Breach to occur.

**H.     Hartford Breached Its Duty to Safeguard Plaintiff's and Class Members' PII**

87.     In addition to its obligations under federal and state laws, Hartford owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.  Hartford owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the PII of Class Members

88.     Hartford breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data and failed to audit, monitor, or ensure the integrity of its vendor's data security practices.  Hartford's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

> a.     Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;
>
> b.     Failing to adequately protect employees' PII;
>
> c.     Failing to properly monitor its own data security systems for existing intrusions;
>
> d.     Failing to audit, monitor, or ensure the integrity of its vendor's data security practices;
>
> e.     Failing to sufficiently train its employees and vendors regarding the proper

handling of its employees PII;

f.    Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

g.    Failing to adhere to the Gramm-Leach-Bliley Act and industry standards for cybersecurity as discussed above; and

h.    Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' PII.

89.    Hartford negligently and unlawfully failed to safeguard Plaintiff's and Class Members' PII by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted PII.

90.    Had Hartford remedied the deficiencies in its information storage and security systems or those of its vendors and affiliates, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the access to and theft of Plaintiff's and Class Members' confidential PII.

**I.    Common Injuries & Damages**

91.    As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their PII;  (e) invasion of privacy; and (f) the continued risk to their PII, which remains in the possession of Defendant, and which is subject to further breaches,

so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

**J.     The Data Breach Increases Victims' Risk of Identity Theft**

92.     Plaintiff and Class Members are at a heightened risk of identity theft for years to come.

93.     The unencrypted PII of Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers.  In addition, unencrypted PII may fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members.  Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

94.     The link between a data breach and the risk of identity theft is simple and well established.  Criminals acquire and steal PII to monetize the information.  Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

95.     Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity – or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

96.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number.  Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information

through means such as spam phone calls and text messages or phishing emails.  Data Breaches can be the starting point for these additional targeted attacks on the victim.

97.     One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[19]

98.     With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

99.     The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers.  In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

100.    The existence and prevalence of "Fullz" packages means that the PII stolen from the data breach can easily be linked to the unregulated data (like driver's license numbers) of Plaintiff and the other Class Members.

---

[19]     "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more.  As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials.  Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web.  Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand.  Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge.  *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, KREBS ON SEC. (Sept. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/ (last visited on Aug. 22, 2023).

101.    Thus, even if certain information (such as driver's license numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

102.    Then, this comprehensive dossier can be sold – and then resold in perpetuity – to crooked operators and other criminals (like illegal and scam telemarketers).

**K.      Loss of Time to Mitigate Risk of Identity Theft and Fraud**

103.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

104.    Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must monitor their financial accounts for many years to mitigate the risk of identity theft.

105.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as researching and verifying the legitimacy of the Data Breach, upon receiving the Notice Letter; and changing passwords and resecuring their own computer networks.

106.    These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[20]

---

[20]      *See* note 18.

107.    These efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity); reviewing their credit reports; contacting companies to remove fraudulent charges from their accounts; placing a credit freeze on their credit; and correcting their credit reports.[21]

108.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[22]

### L.    Diminution Value of PII

109.    PII is a valuable property right.[23]  Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences.  Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

110.    An active and robust legitimate marketplace for PII exists.  In 2019, the data brokering industry was worth roughly $200 billion.[24]

---

[21]    *See IdentityTheft*, FED. TRADE COMM'N, https://www.identitytheft.gov/Steps (last visited Aug. 22, 2023).

[22]    *See* note 18.

[23]    *See, e.g.,* Randall T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[24]    David Lazarus, *Column: Shadowy data brokers make the most of their invisibility cloak*, L.A. TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited on Aug. 22, 2023).

111.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[25]

112.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[26]

113.    Conversely sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.[27]

114.    As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release.  However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

115.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts.  The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change, e.g., names and Social Security numbers.

---

[25]     https://datacoup.com/

[26]     Nielsen Computer & Mobile Panel, *Frequently Asked Questions, available at* https://computermobilepanel.nielsen.com/ui/US/en/faqen.html

[27]     *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Aug. 22, 2023).

116.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

117.     The fraudulent activity resulting from the Data Breach may not come to light for years.

118.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

119.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to thousands of individuals' detailed personal information, upon information and belief, and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

120.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

**M.     Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary**

121.     Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes – *e.g.,* opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

122.     Such fraud may go undetected until debt collection calls commence months, or even years, later.  An individual may not know that his or his Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud.  Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

123.     Consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

124.     The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member.  This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.  This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

**N.     Loss of the Benefit of the Bargain**

125.     Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain.  When submitting PII to receive services from Defendant, Plaintiff and other reasonable Class Members understood and expected that Defendant would properly safeguard and protect their PII, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received an employment position–employee benefits, in particular – of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

**O.     Plaintiff Matheson's Experience**

126.     Plaintiff Matheson is a current employee at Chipotle, which, upon information and belief, contracted with Defendant for the provision of employee benefits.  Plaintiff Matheson has been employed by Chipotle since in or about 2019.

127.    As a condition of his employment and/or to obtain certain employee benefits, he was required to provide his PII, directly or indirectly, to Defendant, including his name, Social Security number, and date of birth.

128.    Upon information and belief, at the time of the Data Breach, Defendant retained Plaintiff's PII in its system.

129.    Plaintiff Matheson is very careful about sharing his sensitive PII.  Plaintiff stores any documents containing his PII in a safe and secure location.  He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.  Plaintiff would not have entrusted his PII to Defendant had he known of Defendant's lax data security policies.

130.    Plaintiff Matheson received the Notice Letter, by U.S. mail, directly from Defendant.  According to the Notice Letter, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties, including his name, Social Security number, date of birth, home state, and zip code.

131.    As a result of the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including: researching and verifying the legitimacy of the Data Breach, upon receiving the Notice Letter; and changing passwords and resecuring his own computer network.

132.    Plaintiff has spent significant time dealing with the Data Breach – valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation.  This time has been lost forever and cannot be recaptured.

133.    Plaintiff suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to: (i) lost or diminished value of his PII; (ii) lost

opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iii) invasion of privacy; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

134.    Plaintiff further suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach.

135.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

136.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

137.    As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

138.    Plaintiff Dusty Matheson has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## V.      CLASS ACTION ALLEGATIONS

139.    Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

140.    Specifically, Plaintiff proposes the following Nationwide Class, subject to amendment as appropriate:

**Nationwide Class**

All individuals in the United States Whose PII Was Impacted as a Result of the Data Breach (the "Class")

141.     Excluded from the Class are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns.  Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

142.     Plaintiff reserves the right to modify or amend the definition of the proposed Nationwide Class, as well as add subclasses, before the Court determines whether certification is appropriate.

143.     The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

144.     <u>Numerosity</u>.  The Class Members are so numerous that joinder of all members is impracticable.  Upon information and belief, Plaintiff believes that the proposed Class includes thousands of individuals who have been damaged by Defendant's conduct as alleged herein.  The precise number of Class Members is unknown to Plaintiff but may be ascertained from Defendant's records.

145.     <u>Commonality</u>.  There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members.  These common questions of law and fact include, without limitation:

        a.      Whether Hartford engaged in the conduct alleged herein;

        b.      Whether Hartford's conduct violated the FTCA and/or GBLA;

        c.      When Hartford learned of the Data Breach;

        d.      Whether Hartford's response to the Data Breach was adequate;

e.       Whether Hartford unlawfully lost or disclosed Plaintiff's and Class Members' PII;

f.       Whether Hartford failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII compromised in the Data Breach;

g.       Whether Hartford's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h.       Whether Hartford's data security systems prior to and during the Data Breach were consistent with industry standards;

i.       Whether Hartford owed a duty to Class Members to safeguard their PII;

j.       Whether Hartford breached its duty to Class Members to safeguard their PII;

k.       Whether hackers obtained Class Members' PII via the Data Breach;

l.       Whether Hartford had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

m.      Whether Hartford breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

n.       Whether Hartford knew or should have known that its data security systems and monitoring processes were deficient;

o.       What damages Plaintiff and Class Members suffered as a result of Hartford's misconduct;

p.       Whether Hartford's conduct was negligent;

q.       Whether Hartford was unjustly enriched;

r.       Whether Plaintiff and Class Members are entitled to actual and/or statutory damages;

s.       Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

t.       Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

146.    <u>Typicality</u>.  Plaintiff's claims are typical of those of other Class Members because

Plaintiff's PII, like that of every other Class Member, was compromised in the Data Breach.

Plaintiff's claims are typical of those of the other Class Members because, inter alia, all Class Members were injured through the common misconduct of Hartford. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

147. <u>Adequacy of Representation.</u> Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

148. <u>Predominance</u>. Hartford has engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Hartford's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

149. <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Hartford. In contrast, conducting this action as a class action presents far fewer management difficulties,

conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

150.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2).  Hartford has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

151.    Finally, all members of the proposed Class are readily ascertainable.  Hartford has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach.  Class Members have already been preliminarily identified and sent Notice of the Data Breach by Hartford.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### Negligence
### (On Behalf of Plaintiff and the Class)

152.    Plaintiff restates and realleges all of the allegations stated above as if fully set forth herein.

153.    Defendant requires its clients' employees, including Plaintiff and Class Members, to submit non-public PII in the ordinary course of providing its services.

154.    Defendant gathered and stored the PII of Plaintiff and Class Members as part of its business of soliciting its services to its clients and its clients' employees, which solicitations and services affect commerce.

155.    Plaintiff and Class Members entrusted Defendant with their PII, directly or indirectly, with the understanding that Defendant would safeguard their information.

156.    Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

157.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.  Defendant's duty included a responsibility to exercise due diligence in selecting IT vendors and to audit, monitor, and ensure the integrity of its vendor's systems and practices and to give prompt notice to those affected in the case of a data breach.

158.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. §45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

159.    Defendant's duty to use reasonable security measures also arose under the GLBA, under which they were required to protect the security, confidentiality, and integrity of employee information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards.

160.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the PII.

161.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Hartford and Plaintiff and Class Members.  That special relationship arose because Plaintiff and the Class entrusted Hartford with their confidential PII, a necessary part of obtaining employee benefits of Defendant.

162.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

163.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the Class.

164.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove former employees' PII it was no longer required to retain pursuant to regulations.

165.    Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

166.    Defendant had and continues to have a duty to adequately disclose that the PII of Plaintiff and the Class within Defendant's possession might have been compromised, how it was compromised, when it was compromised, and precisely the types of data that were compromised. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

167.    Defendant breached its duties, pursuant to the FTC Act, GLBA, and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

   a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

   b. Failing to adequately monitor the security of their networks and systems;

   c. Failing to audit, monitor, or ensure the integrity of its vendor's data security practices;

   d. Allowing unauthorized access to Class Members' PII;

   e. Failing to detect in a timely manner that Class Members' PII had been

compromised;

f.      Failing to remove former employees' PII it was no longer required to retain pursuant to regulations;

g.      Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

h.      Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

168.    Defendant violated Section 5 of the FTC Act and GLBA by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein.  Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

169.    Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act and GLBA were intended to protect and the type of harm that resulted from the Data Breach was the type of harm these statues were intended to guard against.

170.    Defendant's violation of Section 5 of the FTC Act and GLBA constitutes negligence.

171.    The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

172.    A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

173.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members.  Further, the breach of security was

reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the financial industry.

174.    Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if the PII were wrongfully disclosed.

175.    Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures.  Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems.

176.    It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

177.    Plaintiff and the Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

178.    Defendant was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

179.    Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship.  *See* Restatement (Second) of Torts §302B.  Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

180.    Defendant has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

181.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

182.    There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class.  The PII of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

183.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

184.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

185.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as

Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

186.   Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

187.   Defendant's negligent conduct is ongoing, in that it still holds the PII of Plaintiff and Class Members in an unsafe and insecure manner.

188.   Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

<u>COUNT II</u>
**Negligence Per Se**
**(On Behalf of Plaintiff and the Class)**

189.   Plaintiff restates and realleges all of the allegations stated above as if fully set forth herein.

190.   Section 5 of the FTC Act, 15 U.S.C. §45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendant of failing to use reasonable measures to protect PII.  Various FTC publications and orders also form the basis of Defendant's duty.

191.   Defendant's duty to use reasonable security measures also arose under the GLBA, under which they were required to protect the security, confidentiality, and integrity of employee information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards.

192.   Defendant owed a duty of care in protecting Plaintiff's and Class Members' PII, pursuant to Section 5 of the FTC Act, GLBA, and an independent duty of care.

193.    Defendant violated Section 5 of the FTC Act, GLBA, and similar state statutes by failing to use reasonable measures to protect PII and not complying with industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

194.    In its Privacy Policy, Hartford promises its clients' employees that it will not disclose employees' PII, outside of the excepted circumstances set forth therein – none of which apply here.  However, Plaintiff's and Class Members' PII has been disclosed without their written authorization as a result of the Data Breach.

195.    Through its Privacy Policy, and in light of the highly sensitive and personal nature of the information Hartford acquires and stores with respect to its clients' employees, Hartford promises to, among other things: keep employees' PII private; comply with industry standards related to data security and the maintenance of its employees' PII; inform the employees of its legal duties relating to data security and comply with all federal and state laws protecting employees' PII; and provide adequate notice to employees if their PII is disclosed without authorization.

196.    As evidenced by the occurrence of the Data Breach, Defendant negligently misrepresented its data security measures and Privacy Policy to Plaintiff and Class Members.

197.    Defendant violated Section 5 of the FTC Act and GLBA by negligently misrepresenting its data security practices to Plaintiff and Class Members.

198.    Defendant violated Section 5 of the FTC Act and GLBA by breaching its duties of care to Plaintiff and Class Members, as provided in its Privacy Policy.

199.    Defendant further violated Section 5 of the FTC Act and GLBA by failing to ensure that its vendors use reasonable measures to protect PII and not complying with applicable industry

standards, as described in detail herein.  Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and shared and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

200.    Defendant's violation of Section 5 of the FTC Act, GLBA, and other duties (listed above) constitutes negligence *per se.*

201.    Class members are consumers within the class of persons Section 5 of the FTC Act, GLBA, and similar state statutes were intended to protect.

202.    Moreover, the harm that has occurred is the type of harm the FTC Act, GLBA, and similar state statutes were intended to guard against.  Indeed, the FTC has pursued over fifty enforcement actions against financial institutions which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

203.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

204.    There is a close causal connection between Defendant's failure to implement or ensure security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class.  The PII of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

205.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an

increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

206.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

207.    As a direct and proximate result of Defendant's negligence *per se*, the products and/or services that Defendant provided to Plaintiff and Class Members damaged other property, including the value of their PII.

208.    Additionally, as a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

209.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

210.    Defendant's negligent conduct is ongoing, in that it still holds the PII of Plaintiff and Class Members in an unsafe and insecure manner.

211.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to: (i) strengthen its data security systems and monitoring procedures; (ii) submit to

future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT III
**Breach of Third-Party Beneficiary Contract**
**(on Behalf of Plaintiff and the Class)**

212.    Plaintiff restates and realleges all of the allegations stated above as if fully set forth herein.

213.    Defendant entered into written contracts with its clients to provide employee benefits and/or other services.

214.    In exchange, Defendant agreed, in part, to implement adequate security measures to safeguard the PII of Plaintiff and the Class and to timely and adequately notify them of the Data Breach.

215.    These contracts were made expressly for the benefit of Plaintiff and the Class, as Plaintiff and Class Members were the intended third-party beneficiaries of the contracts entered into between Defendant and its clients.  Defendant knew that, if it were to breach these contracts with its clients, the clients' current and former employees – Plaintiffs and Class Members – would be harmed.

216.    Defendant breached the contracts it entered into with its clients by, among other things, failing to: (i) use reasonable data security measures; (ii) implement adequate protocols and employee training sufficient to protect Plaintiffs' PII from unauthorized disclosure to third parties; and (iii) promptly and adequately notify Plaintiff and Class Members of the Data Breach.

217.    Plaintiff and the Class were harmed by Defendant's breach of its contracts with its clients, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

218.     Plaintiff and Class Members are also entitled to their costs and attorney's fees incurred in this action.

**COUNT IV**
**Unjust Enrichment**
**(on Behalf of Plaintiff and the Class)**

219.     Plaintiff restates and realleges all of the allegations stated above as if fully set forth herein.

220.     This count is pleaded in the alternative to the Breach of Third-Party Beneficiary Contract claim above (Count III).

221.     Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of providing their valuable PII, directly or indirectly, to Defendant.

222.     Plaintiff and Class Members provided Defendant their PII, directly or indirectly, on the understanding that Defendant would pay for the administrative costs of reasonable data privacy and security practices and procedures from the revenue it derived therefrom.  In exchange, Plaintiff and Class members should have received adequate protection and data security for such PII held by Defendant.

223.     Defendant benefited from receiving Plaintiff's and Class Members' PII through its ability to retain and use that information for its own benefit.  Defendant understood and accepted this benefit.

224.     Defendant knew Plaintiff and Class members conferred a benefit which Defendant accepted.  Defendant profited from these transactions and used the PII of Plaintiff and Class Members for business purposes.

225.     Because all PII provided by Plaintiff and Class Members was similarly at risk from a foreseeable and targeted data breach, Defendant's obligation to safeguard the PII it collected from its clients' current and former employees was inherent to their relationship.

226.    Defendant also understood and appreciated that Plaintiff's and Class Members' PII was private and confidential, and its value depended upon Defendant maintaining the privacy and confidentiality of that information.

227.    Defendant failed to provide reasonable security, safeguards, and protections to the PII of Plaintiff and Class Members.

228.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII.

229.    Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead made calculated decisions to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

230.    Under the principles of equity and good conscience, Defendant should not be permitted to retain money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures mandated by industry standards.

231.    Defendant's enrichment at the expense of Plaintiff and Class Members is and was unjust.

232.    Defendant acquired the monetary benefit and PII through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

233.    If Plaintiff and Class Members knew that Defendant had not secured their PII, they would not have agreed to provide their PII to Defendant.

234.    Plaintiff and Class Members have no adequate remedy at law.

235.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury as described herein.

236.    Plaintiff and the Class Members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Defendant, plus attorneys' fees, costs, and interest thereon.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and Class Members, requests judgment against Defendant and that the Court grant the following:

A.    For an Order certifying this action as a class action and appointing Plaintiff and his counsel to represent the Class, pursuant to Federal Rule of Civil Procedure 23;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

(i)    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

(ii)    requiring Defendant to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

(iii)    requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide

to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

(iv)     requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

(v)     prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

(vi)     requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

(vii)     requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

(viii)     requiring Defendant to audit, test, and train their security personnel regarding any new or modified procedures; requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

(ix)     requiring Defendant to conduct regular database scanning and securing checks;

(x)      requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

(xi)      requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

(xii)      requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

(xiii)      requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

(xiv)      requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal

identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

(xv)    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

(xvi)    for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of actual damages, compensatory damages, statutory damages, and nominal damages, in an amount to be determined, as allowable by law;

E.    For an award of punitive damages, as allowable by law;

F.    For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

G.    Pre- and post-judgment interest on any amounts awarded; and

H.    Such other and further relief as this court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.

DATED:  August 23, 2023            Respectfully submitted,

                      */s/ Erin Green Comite*
                      Erin Green Comite (CT24886)
                      **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
                      156 South Main Street
                      P.O. Box 192
                      Colchester, CT 06415

Tel.:  (860) 537-5537
Fax:  (860) 537-4432
ecomite@scott-scott.com

Joseph P. Guglielmo (CT27481)
Ethan S. Binder*
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.:  (212) 223-6444
Fax:  (212) 223-6334
jguglielmo@scott-scott.com
ebinder@scott-scott.com

David K. Lietz*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, LLC**
5335 Wisconsin Avenue NW
Washington, D.C. 20015-2052
Telephone: (866) 252-0878
Facsimile: (202) 686-2877
dlietz@milberg.com

Jeff Ostrow*
Kristen Lake Cardoso*
Steven Sukert*
**KOPELOWITZ OSTROW
FERGUSON WEISELBERG GILBERT**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: 954-525-4100
ostrow@kolawyers.com
cardoso@kolawyers.com
sukert@kolawyers.com

Andrew Shamis*
**SHAMIS & GENTILE, P.A.**
14 NE 1st Ave, Suite 705
Miami, FL 33132
Telephone: (305) 479-2299
ashamis@shamisgentile.com

*Counsel for Plaintiff and the Proposed Class*

*\*Pro Hac Vice* application forthcoming

51